

**FILED & ENTERED**

**DEC 30 2020**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** egarcia **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | | | |
|---|---|---|---|
| In re: | Marlon Camar Salamat and Daisy Anne Boiser Salamat, Debtors. | Case No.:<br>Adv. No.: | 2:19-bk-17051-ER<br>2:19-ap-01416-ER |
| Maria Linsangan,<br>          Plaintiff,<br>v.<br>Marlon Salamat and Daisy Salamat,<br>          Defendants. | | **MEMORANDUM OF DECISION FINDING THAT PLAINTIFF IS NOT ENTITLED TO A JUDGMENT OF NON-DISCHARGEABILITY AGAINST DEFENDANTS**<br><br>**TRIAL:**<br>Date:  September 28, 2020<br>Time:  9:00 a.m.<br>Location:  Ctrm. 1568<br>          Roybal Federal Building<br>          255 East Temple Street<br>          Los Angeles, CA 90012 | |

## I. Introduction[1]

In this dischargeability action, Plaintiff Maria Linsangan ("Linsangan") alleges that debt incurred in connection with a Loan Agreement dated March 4, 2017 (the "Loan Agreement") should be excepted from the discharges of Marlon Salamat ("Marlon") and Daisy Salamat

---
[1] This disposition is not appropriate for publication.

("Daisy," and together with Marlon, the "Defendants")[2] pursuant to § 523(a)(2)(A), (a)(2)(B), and (a)(6).

As a result of the COVID-19 pandemic, trial was conducted by videoconference on September 28, 2020.[3] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[4]

For the reasons set forth below, the Court finds that Linsangan is not entitled to a judgment of non-dischargeability against the Defendants under § 523(a)(2)(A), (a)(2)(B), or (a)(6). The Court will enter judgment in favor of the Defendants.

## II. Evidentiary Rulings

On December 16, 2019, the Court entered a Scheduling Order[5] which, among other things, required the parties to "exchange copies of all exhibits which each party intends to introduce into evidence" by no later than thirty days prior to the Pretrial Conference.[6] On September 14, 2020, the Court entered a *Pretrial Conference Stipulation and Order as Modified by the Court* (the "Pretrial Order"),[7] which incorporated a list of trial exhibits submitted by each party.

At trial, Linsangan attempted to introduce into evidence exhibits not listed in the Pretrial Order, and attempted to introduce testimony based upon the unlisted exhibits.[8] Based upon Linsangan's failure to exchange the exhibits with opposing counsel as required by the Scheduling Order, as well as her failure to list the exhibits in the Pretrial Order, the Court refused to admit into evidence either the unlisted exhibits or any testimony derived from such exhibits.

## III. Findings of Fact

Marlon and Daisy were the sole owners of At Home Therapy, LLC ("At Home Therapy").[9] At Home Therapy arranged for independent contractors to provide occupational and physical

---

[2] Given names are used to distinguish Daisy from Marlon. No disrespect is intended.
[3] A transcript of the trial proceedings is available as docket entry 62 and is cited as "Tr." However, the most complete record of the proceedings is the audio recording on file with the Clerk of the Court. The transcript is of limited utility because key portions of the testimony are rendered as "indiscernible." Where necessary, citations to the transcript quoted herein have been supplemented by the Court based upon the audio record.
[4] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.
[5] Doc. No. 13.
[6] Scheduling Order at ¶ 1(h).
[7] Doc. No. 49.
[8] Tr. 112:9–118:2 (Linsangan's attempt to introduce into evidence testimony from Marlon based upon bank statements that had not been listed as exhibits in the Pretrial Order); *id.* at 60:7–61:3 (Linsangan's attempt to introduce into evidence her own testimony with respect to e-mail exhibits not listed in the Pretrial Order).
[9] Pretrial Order at ¶ 1.

therapy services to patients on behalf of registered home health agencies.[10] At Home Therapy would receive payments from the registered home health agencies after those agencies were reimbursed by insurance companies.[11]

At Home Therapy was founded in 2011[12] and ceased operations at the end of 2019 as a result of declining income.[13] The business was profitable prior to 2017.[14] During and after 2017, the payments the business received from registered home health agencies declined because of the agencies' inability to obtain reimbursement from insurance companies.[15]

On February 9, 2017, Linsangan met Marlon at Marlon's condominium in the Philippines.[16] Daisy was not present for the meeting.[17] Linsangan agreed to loan At Home Therapy $100,000. The conversation regarding the loan lasted approximately thirty minutes; the parties also discussed Linsangan's desire to purchase a condominium owned by Marlon for approximately thirty minutes.[18] Marlon explained to Linsangan that At Home Therapy needed a loan because it was experiencing financial difficulties.[19] He told Linsangan that he believed that At Home Therapy would be able to repay the loan,[20] but there was no discussion of At Home Therapy's income or expenses, and Linsangan did not request this information.[21]

The terms of the loan were memorialized in a Loan Agreement dated March 4, 2017 (the "Loan Agreement").[22] The Loan Agreement provided that Linsangan, as lender, agreed to loan $100,000 to At Home Therapy, as borrower.[23] Interest was at the rate of 7% per month ($7,000 per month), with the principal balance coming due as a balloon payment in one year.[24] The Loan Agreement contained an integration clause, which provided that "[t]his Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise."[25]

---

[10] Tr. at 126:7–127:4 (testimony of Marlon); *id.* at 99:14–19 (testimony of Marlon).
[11] *Id.* at 126:10–21 (testimony of Marlon).
[12] *Id.* at 81:21–24 (testimony of Marlon).
[13] *Id.* at 98:24–99:7 (testimony of Marlon).
[14] *Id.* at 122:2–3 (testimony of Marlon).
[15] *Id.* at 124:17–125:6 (testimony of Marlon).
[16] *Id.* at 19:25–20:3 (testimony of Linsangan).
[17] *Id.* at 49:9–14 (testimony of Linsangan).
[18] *Id.* at 61:6–15 (testimony of Linsangan).
[19] *Id.* at 121:14–19 (testimony of Marlon).
[20] *Id.* at 77:2–7 (testimony of Linsangan).
[21] *Id.* at 133:8–24 (testimony of Marlon); *id.* at 83:16–21 (testimony of Marlon); *id.* at 119:1–14 (Marlon's testimony that Linsangan did not ask for any bank statements, tax returns, profit and loss statements, or any other documents pertaining to At Home Therapy).
[22] Defendant's Ex. B.
[23] The parties are designated in the prefatory language of the Loan Agreement. Paragraph 1 of the Loan Agreement states the principal amount of the loan.
[24] Loan Agreement at ¶ 10.
[25] *Id.* at ¶ 17.

Marlon drafted the Loan Agreement,[26] but made two changes requested by Linsangan.[27] First, Linsangan's children were added as beneficiaries of the Loan Agreement.[28] Second, the heading on a table listing the dates upon which interest payments would be made was changed from "7% Fixed Monthly Interest/Dividend" to "7% Monthly Return on Investment."[29]

Prior to executing the Loan Agreement, Linsangan did not perform any research on At Home Therapy,[30] and did not receive any financial information regarding the business[31]:

> **Question (by Defendant's counsel):** And, Ms. Linsangan, when you spoke to [Marlon] in the Philippines he didn't provide you with any bank statements on At Home Therapy, did he?
> **Answer (by Linsangan):** No, he did not.
> **Question:** And he didn't provide you with any bank statements for him and his wife personally, did he?
> **Answer:** No, he did not.
> **Question:** And he did not provide you with any tax returns for At Home Therapy, isn't that correct?
> **Answer:** No, he did not.
> **Question:** And likewise, he did not provide you with any tax returns personally for him and Daisy Salamat, isn't that correct?
> **Answer:** He did not provide.
> **Question:** And so, in fact, the only document that you saw was the loan agreement, correct?
> **Answer:** Yes, correct.

Tr. 54:23–55:14.

Linsangan signed the Loan Agreement at her home.[32] The Loan Agreement is signed by Daisy on behalf of At Home Therapy but is not signed by Marlon. Linsangan was not present when Daisy signed the Loan Agreement.[33] Linsangan first met Daisy in April of 2017 after the Loan Agreement had been fully executed by all parties, and Linsangan had no communications
//

---

[26] Tr. at 23:9–11 (testimony of Linsangan) ("Marlon Salamat put together this loan agreement").
[27] The first draft of the Loan Agreement that does not include the changes requested by Linsangan is available as Plaintiff's Ex. 6.
[28] Loan Agreement at ¶ 13 ("Below are the list of beneficiaries assigned by the Lender as successor of the loan: 1. Joshua Jeffrey T. Linsangan[;] 2. Jonah Elijah T. Linsangan[; and] 3. Jazmine Monique T. Linsangan.").
[29] *Id.* at ¶ 10 (table listing dates upon which interest payments would be made); Plaintiff's Ex. 2 (February 22, 2017 e-mail from Linsangan to Marlon, requesting the change in verbiage pertaining to interest payments).
[30] Tr. at 61:11–15 (testimony of Linsangan).
[31] For the reasons set forth in Part II, above, the Court declined to admit into evidence Linsangan's testimony with respect to e-mails she allegedly received from Marlon containing financial projections for At Home Therapy.
[32] Tr. at 52:9–13 (testimony of Linsangan).
[33] *Id.* at 53:9–19 (testimony of Linsangan).

with Daisy until after Linsangan had executed the Loan Agreement:

> **Question (by Defendant's counsel):** The first—you testified the first time you met Daisy Salamat was in April of 2017 at the office, correct?
> **Answer (by Linsangan):** Yes, that is correct.
> **Question:** And you never met her before the loan, correct?
> **Answer:** Yes, correct….
> **Question:** And you never received any e-mails or text messages from Daisy Salamat before the loan, correct?
> **Answer:** Not from Daisy.
> **Question:** Okay. So, in other words, all your communications before the loan were with Marlon Salamat, correct?
> **Answer:** Yes, correct.

Tr. 49:9–24.

Linsangan delivered the proceeds of the loan by way of a check for $100,000 dated March 7, 2017, made out to At Home Therapy.[34] Shortly after Linsangan signed the Loan Agreement, Defendants mailed to Linsangan a series of post-dated checks, each in the amount of $7,000.[35] The checks were sent to Linsangan pursuant to the Loan Agreement, which provided that monthly interest payments would "be in the form of 12 postdated checks starting on the date as specified in this agreement."[36] The checks were drawn upon At Home Therapy's bank account.[37]

At Home Therapy made the first three interest payments due under the Loan Agreement, in the aggregate amount of $21,000.[38] Each of these three payments was made late—the first payment was approximately one month late; the second payment was approximately two months late; and the third payment was approximately three months late.[39] The $21,000 in interest payments were the only payments made under the Loan Agreement.

Linsangan received the first three payments by cashing the post-dated checks that Defendants had mailed to her.[40] After the first check initially bounced, Linsangan sent Marlon a series of text messages inquiring about the status of the payments.[41] Marlon generally responded by explaining that At Home Therapy had not received the anticipated payments from home healthcare agencies and requesting additional time.[42] In October or November 2017, Marlon advised Linsangan that

---

[34] Plaintiff's Ex. 3.
[35] Tr. 57:2–9 (testimony of Linsangan); *id.* at 26:5–6 (Linsangan's testimony that she received the post-dated checks in early March 2017).
[36] Loan Agreement at ¶ 10.
[37] Plaintiff's Ex. 3.
[38] Tr. at 63:14–16 (testimony of Linsangan).
[39] *Id.* at 63:7–16 (testimony of Linsangan).
[40] Plaintiff's Ex. 1; Tr. at 63:7–25 (testimony of Linsangan).
[41] *See* Plaintiff's Ex. 1.
[42] *Id.*

she would be paid after he received a commission in connection with the sale of one or more properties.[43] These payments never materialized.[44]

Marlon used At Home Therapy's business account to pay his personal expenses and the personal expenses of his wife, Daisy:

> **Question (by Linsangan's counsel):** Mr. Salamat [Marlon], okay, isn't it true that the way you and Daisy conducted the business that it involved you spending a good amount of money—or spending some money for the business being personal—matters of personal—personal of you and Daisy?
> **Answer (by Marlon):** Yes.

Tr. 107:19–24.

Among the personal expenses that Marlon paid using At Home Therapy's business account was a mortgage payment of approximately $1,600.[45]

## IV. Conclusions of Law

A. Marlon and Daisy Are Personally Liable for At Home Therapy's Debts Under the Alter Ego Doctrine

As the Ninth Circuit has explained, a non-dischargeability action requires consideration of two distinct issues: first, a determination of whether the Defendants are indebted to the Plaintiff; and second, a determination of whether the indebtedness is non-dischargeable. *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 868 (9th Cir. 2001).

Under the express terms of the Loan Agreement, At Home Therapy, not the Defendants, are liable for the indebtedness. Nothing in the Loan Agreement indicates that Defendants guaranteed repayment of the indebtedness incurred by At Home Therapy. In addition, the Loan Agreement contains an integration clause providing that "[t]his Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise."[46] However, Linsangan has shown that Defendants are personally liable for At Home Therapy's debts by proving that Defendants are the alter ego of At Home Therapy.

"Under the alter ego doctrine, … when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538–39, 99 Cal. Rptr. 2d 824, 836–37 (2000). As the Supreme Court has explained, "state regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89, 107 S. Ct. 1637, 1649, 95 L. Ed. 2d 67 (1987). Therefore, the circumstances under which shareholders of a corporation may be held liable for the corporation's debt are governed by state law. The Loan Agreement provides that it "will be

---

[43] Tr. 96:11–98:19 (testimony of Marlon); *id.* at 33:13–17 and 35:2–8 (testimony of Linsangan).
[44] There was no testimony regarding whether Marlon ever sold any of the properties from which he anticipated receiving a commission.
[45] Tr. at 108:6–8 (testimony of Marlon); *id.* at 110:24–111:14 (testimony of Marlon).
[46] Loan Agreement at ¶ 17.

construed in accordance with and governed by the laws of the State of California."[47] California law governs whether the corporate veil may be pierced to hold Defendants liable for At Home Therapy's debts.

In California, invocation of the alter ego doctrine requires the satisfaction of two conditions: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538–39. However, the alter ego doctrine "does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form. Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard." *Id.*

Because the "alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds," courts "must look at all the circumstances to determine whether the doctrine should be applied." *Id.* There is no single list of factors that governs when invocation of the doctrine is warranted. In determining whether to apply the doctrine, courts have examined whether any of the following conditions are present:

1) Commingling of funds and assets between the corporation and its owners;
2) Representations by the corporation's owners that they are liable for the debts of the corporation;
3) Use of the corporation as a mere shell or conduit for the affairs of its owners;
4) Inadequate capitalization;
5) Disregard of corporate formalities; and
6) Failure to maintain corporate records.

*Id.*

Here, invocation of the alter ego doctrine is appropriate because Marlon used At Home Therapy's business account to pay his personal expenses and the personal expenses of his wife, Daisy. Personal expenses paid using At Home Therapy's business account included a mortgage payment of approximately $1,600, as well as "a good amount" of other personal expenses.[48] Marlon and Daisy are therefore personally liable for At Home Therapy's debts under the alter ego doctrine.

B. Linsangan is Not Entitled to a Judgment of Non-Dischargeability as to Marlon Pursuant to § 523(a)(2)(A)

Section 523(a)(2)(A) provides: "A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To except debts from discharge, a creditor has the burden of proof under the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654 (1991).

---

[47] *Id.* at ¶ 11.
[48] Tr. at 107:19–24 (testimony of Marlon).

To prevail on a § 523(a)(2)(A) claim on the grounds of false pretenses or false representation, a creditor must prove that:

1) the debtor made the representations;
2) that at the time he knew they were false;
3) that he made them with the intention and purpose of deceiving the creditor;
4) that the creditor relied on such representations; and
5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

Linsangan has failed to identify any false representations that Marlon made prior to execution of the Loan Agreement. Before Linsangan signed the Loan Agreement, she neither received nor asked for the bank statements or tax returns of At Home Therapy or the personal tax returns of Marlon and Daisy. During the thirty minute conversation that led to the Loan Agreement, Linsangan and Marlon did not discuss At Home Therapy's finances. Marlon did tell Linsangan that he believed At Home Therapy would be able to repay the loan, but he also told her that the business was experiencing financial difficulties.

Marlon's expression of belief that At Home Therapy would be able to repay the loan was not an intentionally false representation. At Home Therapy had been profitable prior to the execution of the Loan Agreement in 2017. Marlon conducted additional marketing after the parties executed the Loan Agreement in an attempt to turn the business around.[49] These marketing efforts produced a temporary increase in sales.[50] The record shows that at the time the Loan Agreement was executed, Marlon genuinely believed that the loan could be repaid from a recovery in At Home Therapy's business.

Marlon's attempts to repay Linsangan also show that the representations he made at the inception of the Loan Agreement were in good faith. Had Marlon never intended to repay Linsangan, he would not have caused At Home Therapy to make three interest payments in the aggregate amount of $21,000. The fact that the three payments were made late shows only that the business was struggling, not that Marlon intended to deceive Linsangan when the Loan Agreement was executed. Marlon's offer to make repayments from an anticipated commission on the sale of real estate further demonstrates an intent to repay.

Linsangan's § 523(a)(2)(A) claim against Marlon also fails because she cannot show that the losses she sustained proximately resulted from Marlon's representations. As set forth above, Linsangan conducted no due diligence before extending the loan to At Home Therapy. She could have, but did not, obtained financial information on the business. "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991). Where Linsangan failed to ask Marlon for financial information on At Home Therapy prior to extending the loan, conducted no research on At Home Therapy, and agreed to make the loan after only a thirty-minute conversation, she cannot hold Marlon proximately responsible for the fact that At Home Therapy's cash flow ultimately proved insufficient to fund repayment.

---

[49] Tr. at 122:24–124:11 (testimony of Marlon).
[50] *Id.* at 124:12–16 (testimony of Marlon).

C. Linsangan is Not Entitled to a Judgment of Non-Dischargeability as to Daisy Pursuant to § 523(a)(2)(A)

Linsangan did not personally meet Daisy until approximately one month after the Loan Agreement had been executed, and had no communications with Daisy prior to execution of the Loan Agreement. Because Daisy made no representations to Linsangan before the Loan Agreement was signed, Linsangan's § 523(a)(2)(A) claim fails as to Daisy.

D. Linsangan is Not Entitled to a Judgment of Non-Dischargeability as to Marlon Pursuant to § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge indebtedness obtained through use of a statement in writing:

1) that is materially false;
2) respecting the debtor's or an insider's financial condition;
3) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
4) that the debtor caused to be made or published with intent to deceive....

§ 523(a)(2)(B).

To prevail upon a claim under § 523(a)(2)(B), a creditor must satisfy, by a preponderance of the evidence, the following requirements:

1) a representation of fact by the debtor,
2) that was material,
3) that the debtor knew at the time to be false,
4) that the debtor made with the intention of deceiving the creditor,
5) upon which the creditor relied,
6) that the creditor's reliance was reasonable,
7) that damage proximately resulted from the representation.

*In re Candland*, 90 F.3d 1466, 1469 (9th Cir. 1996), as amended (Oct. 2, 1996).

The requirements are similar to those imposed by § 523(a)(2)(A), except that the creditor must make a heightened showing in two respects: (1) the representation at issue must be *materially* false (as opposed to simply false), and (2) the creditor's reliance must be *reasonable* (as opposed to justifiable).

A statement is "materially false if it includes information which is 'substantially inaccurate' and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths." *Candland*, 90 F.3d at 1470.

A "statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." *Lamar, Archer & Cofrin, LLP v. Appling,* 138 S. Ct. 1752, 1763–64, 201 L. Ed. 2d 102 (2018).

Linsangan argues that the Loan Agreement—and the draft of the Loan Agreement that Marlon sent prior to incorporating Linsangan's requested changes—constitutes a materially false written statement. This argument is without merit. Neither version of the Loan Agreement

contains any statements respecting the financial condition of either At Home Therapy or Marlon and Daisy. The Loan Agreement contains no recitations of At Home Therapy's gross revenue, net income, or any other aspect of its finances. The Loan Agreement merely sets forth At Home Therapy's promise to make specified payments of principal and interest. A promise to pay is not a statement having a direct relation to or impact on the debtor's financial status.

Along similar lines, Linsangan contends that the post-dated checks that she was mailed subsequent to execution of the Loan Agreement qualify as materially false written statements. This argument fails because a check is not a statement respecting a debtor's financial condition. As the Supreme Court has explained:

> Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance.

*Williams v. United States*, 458 U.S. 279, 284–85, 102 S. Ct. 3088, 3091, 73 L. Ed. 2d 767 (1982).

Further, even if the post-dated checks could be construed as statements respecting the debtors' financial condition, Linsangan's § 523(a)(2)(B) claim would still fail because Linsangan was not mailed the checks until *after* she had executed the Loan Agreement. Consequently, the post-dated checks could not have induced Linsangan to execute the Loan Agreement.

E. Linsangan is Not Entitled to a Judgment of Non-Dischargeability as to Daisy Pursuant to § 523(a)(2)(B)

As set forth in Section II.C., above, Linsangan had no communications with Daisy prior to execution of the Loan Agreement. Linsangan's §523(a)(2)(B) claim fails as to Daisy.[51]

F. Linsangan is Not Entitled to a Judgment of Non-Dischargeability as to Daisy or Marlon Pursuant to § 523(a)(6)

"Section 523(a)(6) excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and "malicious' requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 463 (9th Cir. B.A.P. 2015) (internal citations omitted).

An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 463 (internal citations omitted). An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) (internal citations omitted).

---

[51] Linsangan argues that Daisy is liable on account of the post-dated checks because Daisy's handwriting appears on the checks. This argument fails for the reasons set forth in Section II.D., above.

In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under §523(a)(6). *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008). "[C]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Id.* at 1041.

Defendants' failure to cause At Home Therapy to repay all of its obligations under the Loan Agreement was neither willful nor malicious. As discussed in Section II.B., above, Marlon made a good-faith effort to cause At Home Therapy to repay its obligations. Unfortunately, Marlon's efforts to turn the business around proved unsuccessful, and the business could not generate sufficient cash to make full repayment. Defendants' conduct was not willful because they made every effort to cause At Home Therapy to make good on its obligations. The conduct was not malicious because the failure to repay a business debt despite good-faith efforts to do so is not an intentional wrongful act for purposes of § 523(a)(6). Finally, Defendant's failure to repay At Home Therapy's debts under these circumstances is not tortious under California law.

## V. Conclusion

Based upon the foregoing, the Court finds that Linsangan is not entitled to a judgment of non-dischargeability against the Defendants under § 523(a)(2)(A), (a)(2)(B), or (a)(6). The Court will enter judgment in favor of the Defendants consistent with this Memorandum of Decision.

###

Date: December 30, 2020

Ernest M. Robles
United States Bankruptcy Judge